IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TERRY DORSEY, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-15-352 |
| WARDEN FRANK B. BISHOP, JR., | * | |
| Defendant. | * | |

******

# MEMORANDUM OPINION

THIS MATTER is before the Court on the Motion to Renew Motion for Summary Judgment filed by Defendant Warden Frank B. Bishop, Jr.[1] (ECF No. 25), which the Court construes as a motion for summary judgment. The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant the Motion.

## I.   BACKGROUND[2]

### A.   Dorsey's Allegations

Plaintiff Terry Dorsey is a state prison inmate presently housed at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. (Compl. at 1, ECF No. 1). On February 9, 2015, Dorsey filed a Complaint alleging that he suffers from mental illness, NBCI refuses to provide him mental health care, and he is entertaining homicidal and

---

[1] The Court will direct the Clerk to amend the docket to reflect Defendant's correct name.

[2] Unless otherwise noted, the Court takes the following facts from Plaintiff's Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

suicidal ideations as a result. (Id.). Dorsey alleges in his Complaint that "this institution refuses to give me any psychiatric treatment even when I've been diagnosed as having schizophrenia and I believe bipolar disorder." (Id.). Dorsey specifically identifies "the psychology department[,] namely Bruce Liller, Laura Booth, [and James Holwager] within this institution" as the individuals depriving him of health care. (May 7, 2015 Dorsey Decl. ["Dorsey Decl."] at 1, ECF No. 11).

Dorsey claims that in December 2014, he informed a mental health provider he was thinking of killing his cellmate and was placed in a strip cell for an entire week while he received a test. (Compl. at 1). After it was determined there was "nothing wrong" with him, he was placed back into the cell with the same inmate. (Id.). Dorsey asserts that there is, in fact, something wrong with him and notes that he is current on Haldol, an antipsychotic drug, and Prozac, a selective serotonin reuptake inhibitor ("SSRI") antidepressant. (Mar. 18, 2015 Letter ["1st Suppl. Compl."] at 2, ECF No. 6). He asserts that these prescriptions belie any assertion that he does not require mental health treatment. (Id.). Dorsey further notes that he has "been diagnosed with a personality disorder since [he] was a small child or juvenile." (Dorsey Decl. at 1).

In January 2015, Dorsey was placed in the general prison population. (Compl. at 1). He claims he continued to have thoughts of harming others during this time. (Id.). On January 27, 2015, Dorsey contacted the psychology department at NCBI to "get some form of therapy[.]" (Id.). Three days later, Laura Booth, L.C.P.C., told him that the psychology department would not see him because of his "past inappropriate behaviors in the presence of women." (Id. at 1–2). On February 2, 2015, Dorsey filed a Request for Administrative

2

Remedy reiterating that he was mentally ill and that Booth and NCBI were denying him treatment. (1st Suppl. Compl. Ex. 1 ["Pl.'s 1st Exhs."] at 12–13,[3] ECF No. 6-1). Four days later, he wrote a similar letter to NCBI psychologist Bruce Liller asserting that Booth was acting in an abusive manner toward him and denying him treatment. (Dorsey Decl. Ex. 1 ["Pl.'s 2d Exhs."] at 2–3, ECF No. 11-1). Dorsey wrote to Booth on February 6, 2015, to ask for clarification regarding her statement that the NCBI psychology department would not see him. (Pl.'s 1st Exhs. at 10). On February 9, 2015, Dorsey filed the instant Complaint alleging that NCBI would not provide him the mental health care he needed, thereby creating a dangerous situation for him and other inmates. (Compl. at 1).

Following the filing of the Complaint in this matter, Dorsey again requested that NCBI psychologist Dr. James Holwager evaluate him, but several weeks after his request, he still had not been seen. (Dorsey Decl. at 2; Pl.'s 2d Exhs. at 7).

**B.     Medical Records**

Due to Dorsey's lengthy incarceration, his mental health records are voluminous, comprising over 1,300 pages. (ECF No. 25-2). Dorsey's Complaint, however, centers around a specific time period: the denial of mental health treatment beginning in late 2014 and continuing through the filing of this Complaint and the supplements thereto. Accordingly, the recitation of Dorsey's mental health history below will largely confine itself to the period between the middle of 2014 and the middle of 2016.

---

[3] Citations to exhibit page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

On June 3, 2014, Dorsey met with Deirdre Mull, C.R.N.P., to discuss his mood disorder. (Def.'s Mot. Summ. J. ["Def.'s Mot."] Ex. 1 ["Med. Recs."] at 335, ECF No. 25-2). Dorsey reported to Mull that the Prozac he had been prescribed was helping with his mood. (Id.). He denied auditory verbal hallucinations ("AVH")—i.e., "hearing voices"—but requested Haldol, an antipsychotic drug, because it helped with his paranoia and mood. (Id.). Mull noted that Haldol had been discontinued in the past due to Dorsey's noncompliance with requirements that he undergo laboratory testing to monitor side effects, and because health care workers had identified discrepancies in his reported mental illness symptoms in the past. (Id.). She declined to renew Dorsey's Haldol prescription because she questioned the truthfulness of Dorsey's claims of paranoia and because she identified no signs of psychosis or mania. (Id. at 335, 340). Dorsey asked if he could "at least get Benadryl." (Id. at 335) (internal quotation marks omitted).

On July 1, 2014, Dorsey met with Norma Holwager, L.C.P.C. (Id. at 342). Holwager found that Dorsey was alert, oriented, and "did not appear to be attending to internal stimuli although he stated he 'always hears voices, they are just quieter now, like a whisper.'" (Id.). Dorsey denied suicidal and homicidal ideation. (Id.). Holwager found that Dorsey was "hard pressed to generate specifics" regarding his alleged paranoia. (Id. at 343). Holwager concluded that there was no evidence that Dorsey's symptoms were of such magnitude that he needed Haldol, nor was there evidence Dorsey was hearing voices when talking to her. (Id.).

Dorsey met again with Mull on August 22, 2014, and once again claimed that he needed Haldol. (Id. at 345). Mull concluded that Dorsey's complaints of psychosis were

not credible, but prescribed Dorsey Risperdal to help with his impulsivity, aggressive tendencies, and chronic irritability. (Id.).

On September 19, 2014, Dorsey met with Stephen Schellhase, M.D., for a medication check-up. (Id. at 353). Schellhase agreed to switch Dorsey back to Haldol while continuing his prescriptions for Benadryl and Prozac. (Id.). Three days later, Dorsey met with Jessica Nice, L.G.S.W., for individual therapy. (Id. at 360).

On October 2, 2014, Dorsey met with Bruce Liller, Chief of Psychology. (Id. at 361). Liller found that Dorsey was alert, cooperative, and organized in thought and speech. (Id.). Liller stated that while Dorsey identified himself as a schizophrenic, he did not demonstrate any symptoms of that diagnosis during their meeting. (Id.).

Monica Wilson, L.G.S.W., met with Dorsey eight times between November 5, 2014, and December 22, 2014, for individual counseling. (Id. at 369–73, 376, 395, 397). Wilson concluded that Dorsey was "suave" and prone to manipulating others. (Id. at 371). Wilson also stated that Dorsey frequently contradicted himself and that she believed he was vying for a single cell. (Id. at 376, 395).

Dorsey met with Holwager for individual therapy on December 9, 2014. (Id. at 374–75). During the meeting, Dorsey stated that he was hearing voices telling him to kill his cellmate. (Id. at 374). Holwager speculated that Dorsey was falsely reporting symptoms in an attempt to get a single cell. (Id. at 375). Regardless, Holwager erred on the side of caution and recommended that Dorsey receive a single cell. (Id.). Dorsey met again with Holwager on December 10, 2014. (Id. at 384). Holwager administered a Miller Forensic

5

Assessment of Symptoms Test ("M-FAST") to determine whether Dorsey was feigning symptoms. (Id. at 385).

On December 16, 2014, Dorsey met with Mull to discuss medication management. (Id. at 386). Dorsey asserted that he was experiencing mood swings and that he felt the Haldol was not working. (Id. at 387). Dorsey also informed Mull that he was experiencing AVH telling him to hurt people. (Id.). Mull decided to increase his Haldol prescription. (Id.). Mull met again with Dorsey on January 29, 2015, and noted that he requested to be assigned to a single cell. (Id. at 399–400).

On January 30, 2015, Dorsey met with Booth for an onsite consultation. (Id. at 408). Booth noted that Dorsey had an extensive history of sexually preying upon female staff. (Id.). Among other things, Booth noted that Dorsey had a staff alert for stalking female staff, masturbation, and two counts of first-degree rape. (Id.). Booth described Dorsey as having a history of self-reported "hearing voices," but that there had been no validation of his claims through objective clinical documentation in the form of observations or collaborative data. (Id.). She noted that Dorsey had a pattern of noncompliance in taking medication and contradicting himself as to why he failed to take the medication. (Id.). Booth further observed that Dorsey had no pattern of psychotic symptoms, nor did he report such symptoms at that time. (Id.). She informed Dorsey that "his self referrals do not contain legitimate psychological issues," and that he would be referred to a male provider if he continued to abuse the self-referral process. (Id.). She recommended that Dorsey seek group services. (Id. at 410).

Dorsey next met with Liller on February 12, 2015, as part of an investigation into the Administrative Remedy Procedures complaint ("ARP") that Dorsey filed after his meeting with Booth. (Id.). Liller noted that the fact Dorsey was angry rather than relieved when he was told that he was not suffering from a mental illness suggested manipulative behavior. (Id.). Liller concluded that Dorsey's "desire to be viewed as mentally ill does not reflect any cognitive deficit like delusions but instead appears to be a strategy to achieve a desired end." (Id.). Accordingly, Liller dismissed Dorsey's ARP. (Id.).

Dorsey met with Mull on April 22, 2015, to discuss medication management. (Id. at 1285). Mull noted that Dorsey reported that he was doing well on his current medication, sleeping well, and was not experiencing mania or depression. (Id.). Mull continued Dorsey's previously prescribed medication. (Id.). Dorsey's next medication management meeting was with Dr. Leslie Earll on July 25, 2015. (Id. at 1290). Earll found that there was no change from Dorsey's April 22, 2015 evaluation. (Id.). In a subsequent medication management meeting with Dr. Vincent Siracusano on October 6, 2015, Siracusano determined that Dorsey's mental status examination ("MSE") was stable. (Id. at 1296).

Dorsey met with Lauren Beitzel, L.C.P.C., on June 17, 2016, for an onsite consultation. (Id. at 1315). Beitzel stated that Dorsey "believes that he is in need of a single cell due to his voices 'Freckle Face Moo Moo' telling him to harm people. He refuses to provide any details or elaborations on these voices." (Id.). Beitzel challenged him about these purported symptoms, noting that "when he was seen by psychiatry in Jan. 2016 and April 2016 he did not voice any symptoms or concerns consistent with [auditory hallucinations]." (Id.). Beitzel noted that Dorsey had "a long history of Axis II

7

symptomology including boundary testing, inappropriateness, and lack of remorse. He attempted to be evasive and difficult in providing responses." (Id.). Beitzel concluded that Dorsey "does not present with any imminent and specifics threats of harm to others" and that his "reported symptoms lack genuineness and believability." (Id.).

Dorsey met with Siracusano on July 28, 2016, to discuss medication management. (Id. at 1317). Siracusano noted that while Dorsey "continue[d] to speak about hearing and interacting with an imaginary person 'Momo[,]'" Dorsey "did not appear to be responding to internal stimuli[.]" (Id.). Siracusano concluded that Dorsey "apparently has an interest in maintaining a [psychiatric diagnosis]." (Id.).

C.     **Procedural Background**

On February 9, 2015, the Court received correspondence from Dorsey requesting mental health treatment and alleging that he suffers from mental illness, NBCI refuses to provide him mental health care, and, as a result, he is entertaining homicidal and suicidal ideations. (Compl. at 1). The Court treated the correspondence as a Complaint for Emergency Injunctive Relief and directed Bishop to file an expedited response. (ECF No. 2). Bishop filed a Response to Show Cause Order on March 9, 2015. (ECF No. 5). Because the Response provided a substantive answer to the issues Dorsey raised in the Complaint and was accompanied by an affidavit, the Court construed the Response as a Motion for Summary Judgment. (ECF No. 7). The Court notified Dorsey that he may file an Opposition to Bishop's Motion for Summary Judgment with supporting materials. (ECF No. 8). On May 7, 2015, Dorsey filed his Opposition. (ECF No. 11). On September 9, 2016, the Court denied Bishop's Motion for Summary Judgment and directed Bishop to

supplement the Motion with "all relevant medical documentation to refute or confirm Dorsey's allegations regarding the presence of mental illness and any medication Dorsey has received or is currently receiving related to mental illness[.]" (ECF Nos. 20, 21).

On November 7, 2016, Bishop supplemented the Motion for Summary Judgment with Dorsey's medical records and filed a Supplemental Motion to Renew Motion for Summary Judgment. (ECF No. 25). The Court granted Bishop's Supplemental Motion to Renew Motion for Summary Judgment on September 28, 2017, and granted Dorsey time to respond. (ECF No. 60). Dorsey filed Oppositions to Bishop's Motion for Summary Judgment on October 6, 2017, and June 6, 2018. (ECF Nos. 62, 70). Bishop filed a Reply on July 11, 2018. (ECF No. 73).

## II. DISCUSSION

### A. Standard of Review

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011) (citing Gay v. Wall, 761 F.2d 175, 178 (4th Cir. 1985)). Yet "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration

9

explaining the "specified reasons" why "it cannot present facts essential to justify its opposition[.]" Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement[.]" Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party[,]" such as "complex factual questions about intent and motive." Id. at 247 (quoting 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Here, the Court concludes that the requirements for reviewing Bishop's Motion as a motion for summary judgment are satisfied. Dorsey was on notice that the Court would resolve Bishop's Motion under Rule 56 because Bishop styled his Motion as a "Motion for Summary Judgment" and presented extra-pleading material for the Court's consideration. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). In addition, the Clerk informed Dorsey about the Motion and the need to file an opposition. (ECF Nos. 8, 26). Dorsey filed Oppositions, as well as numerous documents and correspondence in support of his claims. Although Dorsey did not submit an affidavit regarding discovery, among Dorsey's filings was a Request for Production of Documents targeted at Bishop. (ECF No. 29). Dorsey, however, fails to explain why the discovery he seeks is critical to demonstrating a genuine dispute of material fact or refuting Bishop's exhibits and

10

declarations. As such, Dorsey has failed to identify specific reasons why more time is needed for discovery as required by Rule 56(d). Thus, the Court will consider documents outside of Dorsey's Complaint and treat Bishop's Motion as one for summary judgment.

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all reasonable inferences in that party's favor. Scott v. Harris, 550 U.S. 372, 378 (2007) (citation omitted); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials[,]" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence[,]" Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence[.]" Fed.R.Civ.P. 56(c)(4).

Following a properly supported motion for summary judgment, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**B.    Analysis**

    **1.    Legal Standard**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976); see also Hope v. Pelzer, 536 U.S. 730, 737 (2002); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F.3d 630, 633

(4th Cir. 2003) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)); accord Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Anderson, 877 F.3d at 543. A prisoner plaintiff must allege and provide some evidence he was suffering from a serious medical need and that defendants were aware of his need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King, 825 F.3d at 218; Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). A serious medical condition is an illness or condition that is either life-threatening or causes an unnecessary infliction of pain when it is not treated properly. See, e.g., Barnes v. Bilak, No. JKB-17-1057, 2018 WL 2289232, at *6 (D.Md. May 17, 2018) (finding that high blood pressure is a serious medical condition); Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998) (finding that pituitary tumor is a serious medical condition); Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 2001) (finding that risk of suicide is a serious medical condition).

"Courts treat an inmate's mental health claims just as seriously as any physical health claims." DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018) (citing Bowring v. Godwin, 551 F.2d 44, 47 (4th Cir. 1977)). Indeed, there is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. Bowring, 551 F.2d at 47. A prisoner is entitled to such treatment if:

> [A] physician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial.

Id. The right to such treatment is based upon the essential test of medical necessity and not whether such care is considered merely desirable. Id. at 48.

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844).

The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendants knew about the

14

problem. Scinto, 841 F.3d at 226. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (quoting Farmer, 511 U.S. at 842).

Mere negligence or malpractice does not rise to the level of a constitutional violation. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986) (citing Estelle, 429 at 106); see also Scinto, 841 F.3d at 225 ("Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" (quoting Farmer, 511 U.S. at 835) (alteration in original)); Russell v. Sheffer, 528 F.2d 318, 318 (4th Cir. 1975) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim under §1983." (citing Gittlemacker v. Prasse, 428 F.2d 1, 6 (3d Cir. 1970))).

The reasonableness of a defendant's actions must be judged through the lens of the risk the defendant actually knew at the time. See Lightsey, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

### 2. Defendant Bishop

Although Dorsey names Warden Bishop as the sole Defendant in this action, Dorsey's Complaint describes conduct by the medical staff at NBCI and does not make

15

any direct allegations against Bishop. Thus, it appears that Dorsey seeks to hold Bishop vicariously liable for the actions of the medical providers at NBCI.

Liability that is based on the defendant's role as a supervisor or employer of the asserted wrongdoer is known as a respondeat superior theory of liability. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Rather, in § 1983 claims, liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with the evidence showing:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks and citations omitted).

Here, Dorsey has not included any allegations in his Complaint or the supplements thereto that would tend to demonstrate that the conduct of the medical providers at NBCI posed an unreasonable risk to Dorsey, that Bishop was aware of these risks but failed to adequately respond, or that Bishop's inadequate response caused a constitutional injury to

16

Dorsey. As a result, Dorsey cannot establish liability on the part of Bishop, and Dorsey's claims against him must be dismissed.

### 3. Medical Providers

Although Dorsey failed to formally name as defendants the individuals responsible for his purportedly inadequate care, Dorsey did consistently identify three individuals—Bruce Liller, Laura Booth, and James Holwager (the "Prospective Individual Defendants")—in his Complaint and the supplements thereto. Accordingly, and in recognition of Dorsey's pro se status at the time he filed his Complaint, the Court will evaluate the viability of his claims against the Prospective Individual Defendants on the merits.

As set forth above, Dorsey's mental health care providers repeatedly denied his requests for prescription medication and a single cell because they concluded Dorsey was not suffering from the mental conditions of which he complained. Dorsey disagrees with his providers' assessments and argues that these refusals violated his Eighth Amendment right to treatment for a serious medical need. However, "disagreement with a course of treatment does not provide the framework for a federal civil rights complaint." Stewart v. Davis, No. JFM-14-570, 2015 WL 751356, at *18 (D.Md. Feb. 19, 2015) (citing Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975)); see also Chisley v. Holwager, No. DKC-09-2099, 2010 WL 2730656, at *4 (D.Md. July 9, 2010) ("Plaintiff disagrees with the judgment of his psychiatric health care providers. Such disagreement with a course of treatment does not provide the framework for a federal civil rights complaint but rather, at most, states a

claim of negligence." (citing Russell, 528 F.2d 318)), aff'd, 447 F.App'x 481 (4th Cir. 2011).

Based on Dorsey's history of manipulative behavior and their observations of him, Dorsey's mental health care providers concluded that rather than describing his actual mental health symptoms, Dorsey was pretending to suffer from various psychoses in order to receive certain benefits, e.g., a single cell. Maryland courts have routinely dismissed § 1983 claims involving similar facts. See, e.g., Cooper v. Sowers, No. JFM-13-3872, 2016 WL 3248209, at *6 (D.Md. June 8, 2016) ("[Plaintiff]'s records suggest his self-diagnosed psychological ailments stem from to his desire to obtain single cell housing."); Williams v. Bishop, No. RWT-12-1616, 2014 WL 4662427, at *6 (D.Md. Sept. 17, 2014) (finding that "[a] prisoner's strong desire to be in a single cell, based on his belief that his medical conditions cause difficulties with cellmates, does not entitle him to housing in a single cell unless medical providers have made a directive for a single cell based on a medical need," and adding that because "there has been no such directive . . . the Plaintiff's claim amounts to a mere difference of opinion over the preferred course of medical treatment" (citing DeFranco v. Wolfe, No. MBC-04-0230, 2008 WL 596735, at *12 (W.D.Pa. Mar. 4, 2008))); Fuller v. Stouffer, No. AW-12-2914, 2013 WL 3353750, at *7 (D.Md. July 1, 2013) ("Given [Plaintiff]'s history of manipulative behavior, it is clear that even assuming he told Defendants that he was being threatened by his cellmates they did not draw the inference that a specific known risk of harm existed. Absent that inference being drawn, an Eighth Amendment claim is not established[.]"), aff'd, 553 F.App'x 352 (4th Cir. 2014); Winters v. Shearin, No. ELH-11-1749, 2011 WL 6300464, at *6 (D.Md.

Dec. 15, 2011) ("He is known to manipulate symptoms and situations in an effort to obtain the housing status he desires. . . . He has failed to demonstrate any violation of his Eighth Amendment right to psychiatric care."); Lewis v. Warden, No. PJM-08-2167, 2010 WL 2998662, at *4 (D.Md. July 22, 2010) (finding that plaintiff had failed to sufficiently allege a constitutional violation where "some of his behaviors appear to be attention seeking, malingering, and . . . designed for secondary gains" (citations omitted)).

Dorsey argues that his claim should survive because he has a history of mental illness and because the descriptions of Dorsey's condition in his medical record are outdated. But a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec, 526 F.3d at 141 (quoting Beale, 769 F.2d at 214). Dorsey has not established a genuine dispute of material fact regarding the deliberate indifference of the Prospective Individual Defendants. Accordingly, to the extent Dorsey intended to bring suit against the Prospective Individual Defendants in this action, they are entitled to summary judgment.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant the Motion to Renew Motion for Summary Judgment filed by Defendant Warden Frank B. Bishop, Jr., which the Court construes as a motion for summary judgment. (ECF No. 25). A separate Order follows. Entered this 10th day of November, 2020.

/s/
George L. Russell, III
United States District Judge